## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**RYAN O'NEAL DAVIS,**

      **PETITIONER,**

v.                                                    **ACTION NO. 2:12cv92**

**RANDALL C. MATHENA,**
**Chief Warden, Red Onion State Prison,**

      **RESPONDENT.**

### REPORT AND RECOMMENDATION

This matter is before the Court on Petitioner Ryan O'Neal Davis' ("Davis") petition for writ of *habeas corpus* filed pursuant to 28 U.S.C. § 2254, ECF No. 1, a memorandum in support, and the Respondent's motion to dismiss the petition, ECF No. 16. The motion to dismiss was referred to the undersigned United States Magistrate Judge ("undersigned") for a report and recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. For the following reasons, the undersigned **RECOMMENDS** the Respondent's motion to dismiss, ECF No. 16, be **DENIED** and Davis' petition, ECF No. 1, be **CONDITIONALLY GRANTED.**

### I. PROCEDURAL BACKGROUND

On January 11, 2008, after a two-day jury trial in Sussex County Circuit Court, Davis was convicted of first-degree murder after having twice been convicted of violent felonies in violation of Virginia Code sections 18.2-32, 19.2-297.1. On January 22, 2008, he was sentenced to a mandatory term of life imprisonment under Virginia law. Davis timely appealed his

conviction to the Court of Appeals of Virginia. The Court of Appeals affirmed Davis'
conviction on June 9, 2009, finding that the trial court properly denied Davis' motion to suppress
and Davis' motion for new counsel. ECF No. 17, attach. 1, at 5-7. The Supreme Court of
Virginia denied Davis' timely petition for appeal on October 6, 2009. On September 30, 2010,
Davis filed a state habeas petition in the Virginia Supreme Court, which was denied on May 25,
2011.

Davis filed the instant § 2254 Petition in this Court on February 6, 2012 and asks that the
Court grant his petition and order a new trial. In his petition, Davis sets forth eleven claims, all
of which were previously presented to the Supreme Court of Virginia and ultimately denied:

    A.    Trial counsel was ineffective because he failed to move to dismiss based on
alleged violations of Davis' speedy trial rights (claim B in the state court habeas);

    B.    Violation of Davis' Fifth and Fourteenth Amendment rights during the custodial
interrogation on June 13, 2006 when Davis asked for counsel but the interrogation
continued, and thus, any statements made were not voluntarily (raised on direct appeal);

    C.    Violation of the right to counsel because the trial court refused to grant his request
for new counsel and trial counsel's Motion to Withdraw (raised on direct appeal);

    D.    Trial counsel was ineffective because he failed to object to Davis wearing leg
shackles that were visible to the jury during all phases of the trial (claim A in the state
court habeas) (hereinafter "Davis' shackling claim");

    E.    Trial counsel was ineffective because he failed to object to the admission of an
autopsy report that stated an alleged opinion as to an ultimate issue of fact at trial (claim
C in the state court habeas);

    F.    Trial counsel was ineffective because he failed to investigate and introduce

documents, including two certificates of analysis and cell phone records, that allegedly supported Davis' testimony and innocence (claim E in the state court habeas);

G.      Trial counsel was ineffective because he failed to request a limiting instruction that James Reece's testimony "should not be considered for the truth of the matter" (claim G in the state court habeas);

H.      Trial counsel was ineffective because he failed to request a specific jury instruction: "where evidence is equally susceptible of two or more interpretations one of which is consistent with innocence, the jury cannot arbitrarily adopt that interpretation which incriminates" (claim H in the state court habeas);

I.      Trial counsel was ineffective because he failed to object to alleged improper remarks made by the prosecutors during closing statements regarding the credibility of a witness, the evidence, and the burden of proof, and trial counsel failed to request a cautionary instruction or move for a mistrial based on those remarks (claim D in the state court habeas);

J.      Trial counsel was ineffective because he failed to raise the issue of sufficiency of the evidence on appeal (claim I in the state court habeas);

K.      Trial counsel was ineffective because he failed to raise other issues that were denied by the Court of Appeals of Virginia in Davis' appeal to the Supreme Court of Virginia (claim J in the state court habeas).

The Virginia Attorney General, on behalf of the Respondent, filed a Rule 5 answer, motion to dismiss, brief in support, and *Roseboro* notice on October 30, 2012. ECF Nos. 15, 16, 17, 18. After an extension of time, Davis filed a brief in opposition on December 13, 2012.[1] The

---

[1] Pursuant to *Houston v. Lack*, 487 U.S. 266 (1988), the Court uses as the date of filing the date Davis certified he placed the response in the prison mailing system.

Respondent did not file a reply brief. On June 6, 2013, the Court ordered the Respondent to provide declarations from individuals with personal knowledge in response to Davis' allegation that he was shackled in view of the jury during trial. ECF No. 25. Subsequently, on June 24, 2013, the Respondent filed a response and an objection to the Court's expansion of the record, with attached affidavits from the following individuals: (1) Circuit Court Judge W. Allan Sharrett, who presided over Davis' trial; (2) Mr. Gary M. Williams, Clerk of the Sussex County Circuit Court, who was present in court to assist with the trial; (3) Commonwealth's Attorney Lyndia Ramsey, who prosecuted the case; and (4) Sheriff Raymond R. Bell, who was present during trial and responsible for the security of Davis as an inmate in custody. ECF No. 26, attach. 1. None of the affiants could specifically recollect whether Davis was shackled during trial in view of the jury. On July 11, 2013, Davis filed a response to the Respondent's objection with his own sworn affidavit attached. ECF No. 27. Davis swore that he was, in fact, shackled during trial in view of the jury.

On July 18, 2013, after determining that the Supreme Court of Virginia had not adjudicated Davis' shackling claim on the merits, the Court granted Davis' request for an evidentiary hearing to determine whether he was shackled in view of the jury and whether such shackling prejudiced his defense. ECF No. 28. The Court also appointed Mr. David Lannetti as counsel for Davis. On October 22, 2013, the Court held the evidentiary hearing, where it heard testimony and argument regarding Davis' shackling claim, and subsequently ordered additional post-hearing briefing. ECF Nos. 47, 48. Davis filed his opening brief through counsel on December 24, 2013, ECF No. 49. The Respondent filed a response on January 10, 2014, ECF No. 50, to which Davis replied on January 17, 2014. ECF No. 51. With briefing now complete, the Respondent's motion to dismiss is ripe for a recommended disposition.

4

## II. STANDARD OF REVIEW

### A. The Court reviews Davis' shackling claim de novo.

A state prisoner, who is incarcerated pursuant to a state court conviction, can petition a federal court for habeas corpus relief on the ground that his incarceration violates the Constitution or laws of the United States. 28 U.S.C. § 2254(a). However, "[i]n the interest of giving the state courts the first opportunity to consider alleged constitutional errors occurring in a state prisoner's trial and sentencing, a state prisoner must exhaust all available state remedies before he can apply for federal *habeas* relief." *Breard v. Pruett*, 134 F.3d 615, 618 (4th Cir. 1998) (citing 28 U.S.C. § 2254(b); *Matthews v. Evatt*, 105 F.3d 907, 910-11 (4th Cir. 1997)). "To exhaust state remedies, a *habeas* petitioner must fairly present the substance of his claim to the state's highest court." *Id.* (citing *Matthews*, 105 F.3d at 911). In Virginia, that court is the Supreme Court of Virginia. "The burden of proving that a claim is exhausted lies with the *habeas* petitioner." *Id.* (citing *Mallory v. Smith*, 27 F.3d 991, 994 (4th Cir. 1994)). Based on the record and the concession by the Respondent, *see* ECF No. 7 at 10 ("The claims in the current habeas petition are exhausted for purposes of federal habeas corpus review."), the Court would **FIND** that Davis exhausted the state court remedies for every claim in the Petition now before the Court by presenting them to Virginia's highest state court.

However, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas petition based on a state court conviction, even if exhausted, "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . [or] resulted in a decision that was based on an unreasonable determination of the facts . . . ." 28 U.S.C. § 2254(d)(1)-(2). As

an initial matter, before the Court adopts this deferential standard of review, the habeas claim must have been "adjudicated on the merits in State court proceedings." *Id.* As discussed previously in the Order granting Davis' request for an evidentiary hearing, the undersigned **FINDS** that Davis' shackling claim (claim D in the instant federal habeas petition and claim A in the state habeas petition) was not adjudicated on the merits by the Supreme Court of Virginia. *See* ECF No. 28.

Specifically, in granting Davis' request for an evidentiary hearing in federal court, the undersigned found that the Supreme Court of Virginia unreasonably denied Davis' request for an evidentiary hearing, when material evidence supporting his shackling claim would have been presented had a hearing been granted. *Id.* at 7. Indeed, in the order dismissing the state habeas petition, the Supreme Court of Virginia referenced the inadequacy of the record to support Davis' shackling claim, which was silent as to whether Davis was shackled. *Id.* (citing ECF No. 17, attach. 2 at 1-2) ("The record . . . demonstrates that counsel does not recall petitioner being in shackles . . . . Nothing in the transcript indicates that petitioner was in shackles during his trial or that, even if he were, the jury was aware."). The Supreme Court of Virginia should have granted Davis an evidentiary hearing to correct the inadequate record. ECF No. 28 at 8. Accordingly, the undersigned concluded that the Virginia Supreme Court did not adjudicate Davis' shackling claim on the merits as contemplated by *Pinholster* and as interpreted by the U.S. Court of Appeals for the Fourth Circuit in *Winston*, and consequently, this Court then expanded the record by granting Davis' request for an evidentiary hearing to further develop facts regarding Davis' shackling claim. *Id.* at 7-8 (citing *Winston v. Pearson*, 683 F.3d 489, 502 (4th Cir. 2012); *cf. Pinholster v. Cullen*, 131 S. Ct. 1388, 1399 (2011)).

A habeas claim that was not adjudicated on the merits in state court is subsequently

reviewed by the federal court de novo. *Cone v. Bell*, 556 449, 472 (2009) (citing *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (stating federal court review "is not circumscribed by a state court conclusion" when the state court did not reach the merits of the *Strickland* analysis))). Accordingly, the Court reviews Davis' shackling claim de novo. *See generally Winston v. Pearson*, 683 F.3d 489 (4th Cir. 2012) (reviewing de novo only one ineffective assistance of counsel claim out of thirty total claims in the habeas petition, after it was determined that the state court did not adjudicate the ineffective assistance of counsel claim on the merits).

### B. The Court reviews Davis' remaining claims under AEDPA's deferential standard.

Again, Davis' petition "shall not be granted with respect to any *claim* that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . [or] resulted in a decision that was based on an unreasonable determination of the facts . . . ." 28 U.S.C. §§ 2254(d)(1)-(2) (emphasis added). The Court **FINDS** that the Supreme Court of Virginia adjudicated Davis' remaining claims on the merits, and the parties do not appear to otherwise contest this characterization. In the previous order granting the evidentiary hearing, the Court limited the evidentiary hearing to developing the record around Davis' shackling claim, because the Court found that the Supreme Court of Virginia failed to adjudicate that claim, and that claim only, on the merits. Accordingly, it is appropriate for the Court to review that one claim de novo, but as to the remaining claims in Davis' petition, because the Supreme Court of Virginia adjudicated those claims on the merits, AEDPA's deferential standard of review applies. *Cf. Winston*, 683 F.3d at 501 (finding "Winston was hindered from producing critical evidence to buttress his *Atkins* ineffectiveness claim—such as

7

the 66 IQ score—by the state court's unreasonable denial of discovery and an evidentiary hearing," and thus, the court reviewed only that claim de novo).

Under AEDPA, when a state court addresses the merits of a claim that is raised in a 28 U.S.C. § 2254 petition, the Court may not grant federal habeas relief on that claim unless, *inter alia*, the state court decision is contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011). The Court independently reviews whether that decision satisfies either standard. *See Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

A state court decision is "contrary to" clearly established federal law if the state court "arrives at a conclusion opposite to that reached by th[e U.S. Supreme] Court on a question of law or if the state court decides a case differently than th[e U.S. Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413. As to whether a state court decision is an "['objectively'] unreasonable application" of clearly established federal law, the state court must "identif[y] the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably appl[y] that principle to the facts of the prisoner's case." *Id.* at 410. Ultimately, though, "state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is *firmly convinced* that a federal constitutional right has been violated." *Id.* at 389 (emphasis added). It is this Court's obligation to focus "on the state court decision that previously addressed the claims rather than the petitioner's freestanding claims themselves." *McLee v. Angelone*, 967 F. Supp. 152, 156 (E.D. Va. 1997).

Under this deferential standard, federal habeas relief is precluded, "so long as 'fairminded

jurists could disagree' on the correctness of the state court's decision." *Richter*, 131 S. C.t at 786. "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)). In other words, "AEDPA prohibits federal habeas relief for any claim adjudicated on the merits in state court, unless one of the exceptions listed in § 2254(d) obtains." *Premo v. Moore*, 131 S. Ct. 733, 739 (2011). Here, as in *Premo*, the Court analyzes Davis' remaining claims to determine whether "the earlier state decision resulted from an 'unreasonable application of' clearly established federal law." *Id.*; 28 U.S.C. § 2254(d)(1).

### C. Ineffective Assistance of Counsel Standard under *Strickland v. Washington*

Under the Sixth Amendment to the Constitution, criminal defendants have a right to reasonably effective representation by counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In general, a defendant who claims ineffective assistance of counsel must show first, that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense. *Id.* First, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "Courts indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance in order to avoid the distorting effects of hindsight." *United States v. Ray*, No. 13-6471, 2013 WL 6354145, at *3 (4th Cir. Dec. 6, 2013) (citing *Burt v. Titlow*, 134 S. Ct. 10, No. 12-414, 2013 WL 5904117, at *6 (Nov. 5, 2013)). Reviewing courts must "judge the reasonableness of the lawyers' conduct as of the time their actions occurred, not the conduct's consequences after the fact." *Frye v. Lee*, 235 F.3d 897, 906 (4th Cir. 2000) (citing *Strickland*, 466 U.S. at 689).

Second, "[t]he defendant must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The *Strickland* court elaborated on this standard by "examining the alternatives rejected." *See McNeil v. Cuyler*, 782 F.2d 443, 448 (3d Cir. 1986) (discussing the *Strickland* prejudice prong). The Court rejected "a lenient standard that would allow a defendant to prevail on a showing that the errors 'had some conceivable effect on the outcome of the proceeding' or 'impaired the presentation of the defense.'" *Id.*; *see also Winston v. Pearson*, 683 F.3d 489, 505 (4th Cir. 2012) (citing *Richter*, 131 S. Ct. at 792) ("The likelihood of a different result must be substantial, not just conceivable."). On the other hand, this does not mean the defendant must "show that counsel's deficient conduct *more likely than not* altered the outcome in the case." *Strickland* 466 U.S. at 693 (emphasis added).

Ultimately, to determine whether the defendant was prejudiced by counsel's deficiencies, the Court's focus "must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland* 466 U.S. at 698. Notably, the standard is not a "reasonable probability of *acquittal*," but rather, "a defendant is required to demonstrate a reasonable probability of a different outcome—a somewhat lower burden for a defendant." *Walker v. Hoffner*, 534 F. App'x 406, 412 (6th Cir. Aug. 16, 2013) (unpublished) (finding other possible outcomes other than an acquittal to include a hung jury, or guilty by reason of mental insanity, both of which would have been better outcomes for the petitioner, who was convicted of first-degree murder).

## II. EVIDENCE PRODUCED AT TRIAL[2]

On January 11, 2008, after a two-day jury trial in the Circuit Court of the County of Sussex, Virginia, Davis was convicted of first-degree murder after previously having been twice convicted of a violent felony.[3] On January 22, 2008, in accordance with the jury verdict, the trial court sentenced Davis to life imprisonment.[4] The following evidence was produced at trial.

On June 13, 2006, Cherri Dowell was found dead in her home, lying face down, lodged between a bed and the wall. That day, a Tuesday, Dowell did not report to her job as a fourth-grade teacher at Annie B. Jackson Elementary School. The school secretary, Barbara Gray, went to Dowell's home to check on her welfare, because it was strange for Dowell to not report for work without advising Gray, or at least another colleague, of a planned absence. After arriving at Dowell's home, Gray observed an open window and discovered that Dowell's car was not in the driveway/carport. Without ever going inside Dowell's home, Gray returned to the school and called the police. Upon arriving at the scene around 10:00 a.m. on June 13, 2006, Sergeant Ernest Giles of the Waverly Police Department testified that he saw Dowell's empty carport and the open window on the side of the house. After further investigation, Giles discovered the side door leading from the carport into the home was locked, and instead entered the home through the unlocked front door. Giles testified that once inside the home, he immediately "smelled

---

[2] This evidence produced at trial is summarized from the trial transcript and other state court records, which were received by this Court on March 7, 2013.

[3] Davis was also charged with grand larceny and breaking and entering, but those charges were bifurcated and continued by the trial court on the Defendant's motion at the start of trial with no objection from the Commonwealth.

[4] The trial court's sentence of life imprisonment was mandatory in accordance with Va. Code § 19.2-297.1, because the evidence showed Davis had previously been convicted of two violent felonies. *Id.* ("Any person convicted of two or more separate acts of violence . . . shall, upon conviction of a third . . . be sentenced to life imprisonment."). Specifically, Davis was convicted of malicious wounding on two prior occasions: January 29, 1986 and August 2, 1995, both in Sussex County, Virginia. He was also convicted of robbery on August 2, 1995. Copies of the three conviction orders were admitted into evidence as exhibits in Davis' trial for first-degree murder.

blood," and noticed that the house was in complete disarray. Giles clarified on cross-examination that as a housekeeping observation, the entire house was very messy, with papers on the floor and clothing in piles. Indeed, photographs of Dowell's house, admitted as Commonwealth's exhibit nine, showed that the entire house was extremely cluttered, not just the room where her body was found. Giles found Dowell's body lodged between what he described as a "day bed" and the wall, and her body was very cold to the touch.

The Commonwealth's theory of the case began while Davis was incarcerated at Wallens Ridge State Prison for the 1995 malicious wounding and robbery convictions. During that time, Davis befriended Dowell, and upon his release from prison in February of 2006, she offered tutoring services to Davis and attempted to assist him in securing employment. The Commonwealth argued that eventually, sometime between Davis' release from prison and Dowell's death, their relationship soured, because Dowell believed Davis stole money from her, and reported him to the police. Four individuals testified about previous conversations they had with Dowell regarding Davis. The trial court admitted their testimony only for purposes of establishing Dowell's state of mind, and her purported fear of Davis in the months and days leading up to her death. The trial judge gave such limiting instructions to the jury. The trial court did not allow testimony regarding the fact that charges were brought against Davis for stealing money from Dowell, and that those charges were eventually dismissed.

First, Gray testified that on June 12, 2006, the day before Dowell's body was found, Dowell told Gray that she believed Davis had previously stolen money from her. Gray testified that Dowell talked about being afraid of Davis. Second, Jamica Giles, Dowell's next-door neighbor and friend of two years, testified that she last spoke to Dowell on the telephone around 8:45 p.m. on June 12, 2006, but they did not specifically discuss Davis. However, throughout

May and early June of 2006, Giles testified that Dowell told her she was afraid of Davis, and was "afraid that something was going to happen." When asked why, Giles testified that Dowell said Davis had called and threatened her, and previously vandalized her vehicle by breaking out the windows. Third, Katrina Perry, Dowell's former co-worker, testified that during the afternoon of June 12, 2006, Dowell spoke with her right before Perry went to McDonald's. Perry offered to buy food for Dowell because Dowell stated she did not have any money, due to the alleged theft by Davis. Once Perry returned, Dowell told Perry she was scared of Davis, and Perry listened to three or four threatening voicemails allegedly left by Davis for Dowell. One voicemail "was just him breathing." Another voicemail stated that Dowell would regret it, and another asked, "why are you telling people I stole your money?" or "why did you go down to the police department?" Perry testified that this was the only time Dowell ever discussed Davis with her.

Lastly, Cheryl Taylor, Dowell's best friend and former co-worker, testified that in 2006, she was no longer teaching at the same school as Dowell, but that they talked on the phone two or three times a week. Taylor testified that Dowell first started talking about Davis in 1999 or 2000, when she accompanied Davis' mother to visit him at Wallens Ridge State Prison. Towards the end of February 2006, after Davis had been released, Taylor testified that Dowell continued her friendship with Davis, but there came a time when Dowell believed Davis had stolen money from her car. Specifically, Taylor testified that on March 1, 2006, after having been paid a couple of days earlier, Dowell realized money was missing. Taylor testified that she called the police, not Dowell, and reported the alleged theft by Davis. Taylor also testified that she had listened to several threatening voicemails left by Davis, which became more aggressive starting in April. After that, Taylor testified that Dowell told her the tires of her car had been slashed, and the windows were broken out. At this point, Taylor testified that she suggested to

Dowell that she move out of Sussex County to avoid further problems.

The Commonwealth argued that the threats and vandalism culminated in the early morning hours of June 13, 2006, when Davis broke into Dowell's home through the open window, a struggle ensued, and Davis eventually strangled Dowell to death. Medical examiner Dr. Deborah Kay performed Dowell's autopsy. She testified at trial, and her autopsy report was admitted into evidence. The autopsy report showed that at the time of her death, Dowell was thirty-five years old, five feet eight inches tall, and three-hundred and thirty-two pounds. In general, Dr. Kay testified that there were scrapes, lacerations, and bruises present on Dowell's head, face, neck, and upper body. There was also a scalp hemorrhage, but none of these blunt force injuries to the head or face were lethal. Moreover, Dr. Kay was unable to determine the official cause of Dowell's death, but given the blunt force injuries, she concluded that "homicidal violence [was] a distinct possibility." In addition to the external findings, Dr. Kay noted three heart issues: visceral congestion, a non-specific finding when organs appear full of blood; mild biventricular dilatation, meaning Dowell's heart was abnormally dilated on both the right and left side; and focal subendocardial perivascular fibrosis, or the presence of small scarring of the heart. Lastly, Dr. Kay testified that she recovered a clump of hair found in Dowell's left hand, and some hair found on her chest; both of which were given to law enforcement officials.[5] Additionally, Dr. Kay provided a physical evidence recovery kit ("PERK"), comprised of physical evidence taken from Dowell's body, to law enforcement officials.

Sarah Seashols, a former forensic scientist with the forensic biology section of the Virginia Department of Forensic Science, testified and was qualified as an expert in DNA analysis. Seashols received various items of physical evidence related to Dowell's death,

---

[5] Davis is bald, and photographs admitted into evidence at trial show that he was also bald on June 13, 2006.

analyzed them for DNA profiles, and completed a report documenting her findings, which was introduced into evidence. Specifically, Seashols received the following items: buccal cheek swabs taken from Davis, the PERK from Dowell's body, a pair of tennis shoes, boxer shorts, a black and gray sweatshirt, black sweat pants,[6] an iron with a broken handle, and a boom box. She only analyzed the buccal swabs, PERK, tennis shoes, sweatshirt, boxer shorts, and sweat pants for DNA evidence. Based on her analysis, Seashols developed two DNA profiles from the fingernail clippings included in the PERK: Dowell's DNA profile and a foreign DNA profile, and Davis could not be eliminated as a possible contributor. On the sweatshirt, Seashols analyzed two stains, one on the left sleeve, and one on the stomach area. On the sleeve stain, Dowell could not be eliminated as a contributor, and on the stomach stain, both Dowell and Davis could not be eliminated as co-contributors. Seashols testified on cross-examination that, while the hair clump was submitted to the lab for DNA analysis, she did not perform DNA analysis on the hair.[7]

The Commonwealth also elicited testimony from law enforcement officials regarding their investigation into Dowell's death and any statements provided by Davis. In the early afternoon of June 13, 2006, Davis' name surfaced as a person of interest, and two officers went to the home of Davis' parents to locate and speak with Davis. Once at Davis' house, Sergeant

---

[6] Captain Gwaltney of the Waverly Police Department testified that he instructed Corporal Donnell Stewart to respond to Davis' residence to retrieve a sweatshirt and a pair of sweatpants. Stewart did so, and brought the clothing back to the police station, where Davis confirmed that those were the clothes he was wearing the night before when he encountered Dowell. Gwaltney then gave the clothing to Sergeant Diggs, who was responsible for processing the crime scene and physical evidence.

[7] There was no evidence before the jury as to whether the hair was analyzed for DNA. Outside the presence of the jury, defense counsel objected to a different certificate of analysis from another forensic scientist, Charles Lynch. Defense counsel objected on hearsay grounds, which the trial court sustained, because Lynch, the creator of the certificate record was not present to testify, and the Commonwealth failed to comply with the statutory requirements for a self-authenticating certified record. In the certificate of analysis, Lynch reported that the clump of hair was submitted for DNA analysis, but that there was not enough hair to test, and therefore, no DNA results were rendered or presented as evidence.

Giles informed Davis that Captain Graham Gwaltney wanted to speak with him at the police department. Davis voluntarily rode in the backseat of Sergeant Giles' car after being advised that he could sit in the front, that he was not being detained, nor was he under arrest. No words were exchanged during the drive to the police station. At the police station, Davis waited in a holding room until Captain Gwaltney arrived, at which point he initially spoke to Davis for about ten minutes in the booking room. Captain Gwaltney advised Davis that he was not under arrest, but that he was being held for investigative detention questioning. After this, Captain Gwaltney took Davis into his office for an interview; no one else was present in the office.

First, after receiving Davis' consent, Captain Gwaltney took multiple photographs of Davis' body, which were introduced at trial as Commonwealth's exhibit four, to document any injuries or scratches on Davis' person. Captain Gwaltney testified to seeing three small scratch marks on the neck or chest area of Davis. Next, once alone in his office with Davis, Captain Gwaltney testified that he read Davis his *Miranda* rights, Davis waived his rights and filled out a form documenting his waiver. Before the interview started, Captain Gwaltney testified that Davis spontaneously asked, "This is about Cherri, isn't it?" While referring to contemporaneous notes he took during the interview,[8] Captain Gwaltney testified to the following statements by Davis ("Davis' First Statement"):

Davis said he saw Dowell two weeks earlier in town, when she stopped him to talk about "a previous arrest." Subsequently, three days later, Davis went to Dowell's house, she apologized for having him arrested, and the two had sex. Davis reported his last encounter with Dowell occurred on June 12, 2006 at approximately 3:00 p.m., when Davis saw Dowell driving

---

[8] During this first interview, Captain Gwaltney testified that he took one page of notes, which he referred to as he testified. On cross-examination, defense counsel elicited that not only was this Gwaltney's first homicide investigation as lead investigator, but that "words were said other than what you've repeated to us today," and that he did not videotape or audiotape the interview.

in town, the two waved at each other, and she kept driving. Davis also reported drinking at Horton Circle earlier that day, around 2:00 p.m., and that between 9:00 p.m. and 11:00 p.m., Davis shared a bottle of wine with Lorenzo Turner. After that, around 11:00 p.m., Davis met up with William Elder, also known as "Poochie," went to the store and got a beer, only to return to the store between 1:00 a.m. and 2:00 a.m., at which point Poochie went home. Davis then returned to his mother's house, sat on the back deck for an hour, but then left and started walking down Railroad Avenue, at which point he was picked up by an individual named "Tim," who drove Davis to Petersburg and left him at a gas station. From there, Davis reported hooking up with two females, went to a "boot liquor joint," had a couple more drinks, and then hitched a ride back to his mother's house from an older man, arriving between 5:30 a.m. and 6:00 a.m. Captain Gwaltney testified that Davis' first statement concluded around 2:55 p.m. on June 13, 2006 with Davis requesting an attorney.[9]

From there, Davis was returned to the booking room with Sergeant Giles and Captain Williams.[10] Captain Gwaltney advised that Davis was detained, pending further action from the Commonwealth Attorney's office. At this point, while sitting on the booking bench with Sergeant Giles and Captain Williams present, Davis attempted to continue talking about prior events, including statements about how he got scratched during a basketball game at some point on June 12, 2006. Sergeant Giles testified that Captain Williams advised Davis that they could not take additional statements from him, that Davis had requested an attorney, and they could not "violate his rights." After Davis persisted, Sergeant Giles testified that Captain Williams again

---

[9] Sergeant Giles testified that the first interview with Davis in Captain Gwaltney's office lasted anywhere from forty-five (45) minutes to an hour and fifteen minutes, while Captain Gwaltney testified that the first interview with Davis lasted an hour and forty minutes.

[10] Sergeant Giles testified that Captain Williams was with him and Davis in the booking room. Initially, Gwaltney testified that a "Captain Davis" was also present in the room, but then corrected himself on re-direct examination and testified that only Sergeant Giles and Captain Williams were present with Davis in the booking room.

reviewed Davis' rights with him, at which point Davis again waived all of his rights and wanted

to make an additional statement.  Sergeant Giles did not record this statement electronically, nor

did he contemporaneously take notes.  The only thing Sergeant Giles recorded was Davis'

Miranda waiver, and the time of the waiver, which was 4:02 p.m.[11]  Sergeant Giles testified that

Davis made the following statement to him and Captain Williams ("Davis' Second Statement"),

which started off as similar to the statement Davis had just given Captain Gwaltney:[12]

Davis reported that two weeks prior to June 13, 2006, he came into contact with Dowell

and she wanted to talk about a false arrest that was made prior to this incident regarding the

stolen money.  Three days later, Davis went to Dowell's house, they discussed the incident

surrounding the stolen money, reconciled their differences, and had sex using a condom.  Next,

Davis stated that on June 12, 2006, he saw Dowell again in town and they spoke to one another.

Later that night, around 11:30 p.m. or 11:45 p.m., after parting ways with "Poochie," Davis

returned to his mother's house and was drinking a beer on the back deck when he decided to go

to Dowell's house.  Davis stated that he walked to Dowell's house, knocked on the front door,

and Dowell answered the door in her nightgown.  Davis initially reported that they discussed the

prospect of Dowell going back to an ex-boyfriend who had been abusive to her.  Davis then

stated that they walked into the back bedroom, where they sat down on the bed, and began to

engage in foreplay.  However, Davis became disinterested and stopped after five or ten minutes.

Davis stated that he got up, advised Dowell he was leaving, at which point she told him that he

---

[11] On cross-examination, Captain Gwaltney testified that Davis was in the booking room with Giles and Williams from 2:55 p.m. when the first interview concluded, to approximately 5:10 p.m., when Captain Gwaltney took Davis back into his office for what would be his third statement to police.  Therefore, Davis' second statement occurred from approximately 4:02 p.m. to 5:10 p.m.

[12] At this point, during Davis' Second Statement, Captain Gwaltney testified that he was around the corner "in the hallway," which was "approximately five feet away" from where Davis was talking to Giles and Williams. Gwaltney testified that he listened to all but the first five to ten minutes of the statement, but claims that at no time did Davis mention playing basketball or Dowell's abusive ex-boyfriend.

couldn't leave until they had sex. Davis said no, but each time he tried to leave, Davis reported that Dowell would grab him, and he would push her back down to the floor, which happened several times. The last time, Dowell jumped on Davis' back, and that's when Davis stated he elbowed Dowell with his right arm, knocking her down to the bed. Davis then stated he went to leave, looked back at Dowell who raised her head up and "called him a motherf-----," at which point Davis turned off the light, went to the carport, opened the door to Dowell's car, found her car keys, and left the residence with her car. Davis then stated that he "came to his senses" and parked the car at the Waverly swimming pool, left the keys in the car, and hitched a ride from a car on Route 40.

Next, at approximately 5:10 p.m., Captain Gwaltney took another statement from Davis ("Davis' Third Statement").[13] Gwaltney brought Davis back into his office and Gwaltney "asked him if pretty much everything he had told me in my first interview was a lie. [Davis] advised yes." Davis' statement then proceeded: at around midnight, or 12:00 a.m. on June 13, 2006, Davis stated that he went to Dowell's residence. She let him inside the house, they went to the back bedroom, got into an argument, which resulted in a physical struggle, and Davis ended up pushing Dowell onto the floor. Davis stated that Dowell grabbed him from the rear and scratched him, at which point Davis hit Dowell with his elbow in the mouth or face area, knocking her onto the bed. Davis stated that as he was leaving the residence, Dowell was cursing him, it was approximately 12:30 a.m. or 1:00 a.m., and Dowell was fine, she was not dead. Next, Davis reported stealing Dowell's vehicle, and drove it to the Waverly swimming pool because he was angry with Dowell. At this point, Gwaltney's second interview with Davis

---

[13] On cross-examination, Captain Gwaltney testified that this interview lasted from approximately 5:10 p.m. to 7:25 p.m., and that during that time, he took between a one-half and three-quarters of a page of notes. This period of time included multiple cigarette, food, drink, and bathroom breaks for Davis. At the conclusion, Davis signed and dated Gwaltney's notes. Gwaltney's original notes were included in the state court records received by this Court.

concluded, which comprised the third statement that Davis gave to law enforcement.

Finally, on June 21, 2006, after Davis was in custody and charged with the murder of Dowell,[14] Sergeant Kevin Diggs testified that Deputy Gay at the Sussex County Jail advised him that Davis wanted to speak to him. Sergeant Diggs testified that he had known Davis since Davis was a little kid, and that he was a few years older than Davis. Before Sergeant Diggs spoke to Davis, he advised him of his Miranda rights at approximately 1:17 p.m., which Davis waived. This statement from Davis followed ("Davis' Fourth Statement")[15]:

Initially, Davis asked Diggs whether a funeral service had been provided for Dowell, and Davis asked whether the autopsy results for Dowell had come back yet. With regard to the night in question, Davis stated that when he went to Dowell's house, he knocked on the back side door, she asked through the closed door who it was, Davis responded it was him, and she let him into the house. At the time, she was on the telephone and was wearing a bathrobe. Davis and Dowell moved into the bedroom, where they engaged in foreplay, but at some point, Davis became disinterested, as stated previously during Davis' Second Statement. Davis informed Dowell of this, went to leave the residence, at which point Dowell said, "Oh, you're going to see Cindy." Davis was startled that Dowell knew who Cindy was. At that point, Dowell grabbed Davis as she got up, and he pushed her in the chest and neck with a step forward. Diggs read from his notes taken after his interview that "Davis advised that he was grabbed by Ms. Cherri and he elbowed her in the mouth. Ryan Davis advised that he got up to leave the area of bedroom 2, and [then] advised that she grabbed him again, scratching him in the chest area."

---

[14] Based on state court records, Davis was charged and held without bail as of 8:25 p.m. on June 13, 2006.

[15] Diggs did not take contemporaneous notes as he listened to Davis' statement. Instead, Diggs testified that he made notes later that evening, about five or six hours after he spoke with Davis. During his testimony, he referred to those notes, which defense counsel objected to because they were not taken contemporaneously. The trial court overruled the objection and allowed Diggs to read from his notes taken six hours after his interview with Davis.

Then, Davis stated that he pushed her again, she fell back onto the bed, he turned away from her and she stated something to the effect of "Oh, f---." Davis exited the house, got into Dowell's vehicle, and drove away. Diggs testified that Davis' Fourth Statement lasted approximately forty-five minutes.[16]

The Commonwealth also relied on testimony from James Reece, a former cellmate of Davis' during 2007, while Davis was incarcerated pending trial. Reece testified that Davis talked about Dowell on a regular basis, and told him that he had killed Dowell. Reece testified that during a "role play," Davis told him that he went to Dowell's house intending to steal money from her, and that he entered through a side window. Davis claimed that when he went through the window, he pulled a curtain rod down and tripped over the curtain or couch immediately below the window, which startled Dowell, who was on the phone. Reece testified that Davis was upset because Dowell knew him, and would be able to identify him, so "he yoked her up," which Davis explained was similar to a choke hold. Davis told him that Dowell struggled and screamed for a bit, and when she stopped moving, he dropped her, and her head hit the wall or sheet rock. After that, Davis left through the front door with Dowell's money, stole her car, and drove to a hotel, where he met up with another man to smoke crack cocaine all night. Reece testified that Davis told him this exact story several times while they were incarcerated in the same cell for one month.

After the Commonwealth rested, Davis offered testimony from Mike Williams, a man who was incarcerated with Davis and Reece. Williams testified that while Reece never specifically mentioned Davis' case to him, but he did remember Reece telling him that he would do anything to get out of jail. Davis also called Ernest Barrow, who testified that he saw Davis

---

[16] Diggs was also the primary law enforcement officer charged with crime scene and physical evidence processing, and he testified regarding the pictures he took of Dowell's home and the crime scene. He also testified about the physical evidence that he delivered to the forensic laboratory, including the clothing items discussed above.

playing basketball with a large group of people the afternoon of June 12, 2006. Lastly, Davis

testified in his own defense. During his testimony, Davis testified that he kept legal papers in his

cell, and that he let Reece read the transcript of the preliminary hearing, which included the

factual theory of the Commonwealth's case. Otherwise, he testified that he never talked about

his case with Reece, no more than what was printed about it in the newspaper.

Davis also testified that he met Dowell while he was incarcerated, and upon his release

from prison in February of 2006, Dowell was the first person to take him out to dinner. Davis

also recounted her allegation that he stole money out of her car, that he was arrested for the

charge, but that the charge was eventually dismissed. About a month, or a month and a half,

after he was released from prison, Davis testified that he saw Dowell driving in town, and that

they had a conversation. After that, Davis testified on June 2, 2006, he went to Dowell's house

and had sex with her that day. He testified that Dowell also invited him over on June 12, 2006.

Prior to that, Davis claims he never left Dowell threatening voicemail messages, and that the two

of them had worked out their differences regarding the stolen money. On June 12, 2006, Davis

claimed that earlier in the day, around 4:00 p.m., he was at the basketball court by the elementary

school playing basketball and drinking with a group of friends. Davis testified he had two or

three beers and that he left around 6:00 p.m.

Davis went on to testify that during the game of basketball, it got physical, he was

scratched on his neck, he started bleeding, and he used his sweatshirt to wipe off the blood.

After he was done playing basketball, Davis testified that he went to Horton Circle to hang out

with a bunch of guys who were continuing to drink. From there, he went to Dowell's house

around 8:00 p.m. or 8:30 p.m. Davis testified that he knocked on the rear door, and Dowell came

to the door wearing a night robe while talking on the phone. She let him in and they went to her

bedroom.  Dowell continued to talk on the phone for about five minutes, after which she got off the phone and they had a conversation for about half an hour.  Davis testified that they eventually got into a disagreement about him "messing with another female."  As he was getting up to leave, Dowell grabbed him from behind and scratched his chest area, leaving red marks.  At the same time, he turned around to face her and accidentally elbowed her in the face, which caused Dowell's nose to bleed.  Davis testified that Dowell was upset, but he took his shirt to wipe her face off, and he stayed for an additional ten minutes.  After that, Davis left, around 9:30 p.m. or 9:45 p.m., and Dowell was still sitting on the bed, holding her head back in an attempt to stop the nose bleed, but otherwise she appeared to be fine.  From there, Davis claimed he went back to Horton Circle and eventually went to Petersburg with a friend, but did not get back to his mother's house until 5:00 a.m. or 6:00 a.m. on June 13, 2006, at which point he did not know Dowell was deceased.

Later that day, Davis testified that he was taken to the police station and asked about his interactions with Dowell.  He testified that he did give statements to the police, including the fact that he had been to Dowell's house the day before.  He allowed the police to take pictures of his body, and he testified that he gave a consistent story about Dowell grabbing him while simultaneously turning around and elbowing her in the face.  Other than the nosebleed, Davis testified that he told police that Dowell was fine when he left her house.

On cross-examination, Davis testified he gave consistent stories to the police.  Davis testified that from the beginning, he told Captain Gwaltney that he went to Dowell's house.  When questioned about discrepancies in any details, Davis claimed that the law enforcement officers who testified were not telling the truth, or their testimony regarding his statements was inaccurate.  Davis also testified that he never told any officers that he took Dowell's car.  Davis

claimed that testimony he gave at trial was the same testimony he gave to each police officer who interviewed him.

### III. PROPOSED FINDINGS OF FACT

At the conclusion of the guilt phase of the trial, the jury had six verdicts to choose from, based on the jury verdict form, created by the trial judge, and contained in the state court records: (1) guilty of first degree murder after having been twice convicted of a violent felony; (2) guilty of first degree murder; (3) guilty of second degree murder after having been twice convicted of a violent felony; (4) guilty of second degree murder; (5) guilty of assault and battery; or (6) not guilty. After finding Davis guilty of the most serious offense, first degree murder after having twice been convicted of a violent felony, the jury, and subsequently the trial court, imposed a life sentence as required by Virginia law.

Davis was in custody and held without bail from June 13, 2006 until sentence was imposed on January 22, 2008. Accordingly, he was in the custody of the Sussex County Sheriff during his two-day trial January 10-11, 2008. Davis was represented by court-appointed local attorney Clinton Clary, who is known in that jurisdiction to be a competent, capable, and zealous criminal defense attorney. Evidentiary Hearing Transcript, ECF No. 48, at 32 (Oct. 22, 2013) (hereinafter "Tr."). At the beginning of his trial, Davis told the trial judge, W. Allan Sharrett, that he was not satisfied with Mr. Clary's services because he alleged Mr. Clary had breached the attorney-client privilege. *Id.* However, at that time Davis did not raise the issue of being shackled, and because Davis could not allege specific facts to support such dissatisfaction with Mr. Clary, Judge Sharrett did not act on Davis' allegations regarding Mr. Clary's services. In consideration of the sworn affidavits attached to briefs in this matter and the evidence presented at the evidentiary hearing, the Court would **FIND** the following facts as it relates to Davis'

shackling claim.

### A. Davis was shackled during his trial in view of the jury without justification.

Based on the testimony from the evidentiary hearing, as discussed more fully below, the Court would **FIND** that Davis was wearing leg irons, or shackles, during his trial in view of the jury without justification. First, none of the Commonwealth's witnesses who testified during the evidentiary hearing could specifically recollect, or testify with full confidence, that Davis was not wearing shackles during his trial in view of the jury. Judge Sharrett, who has been a Circuit Court Judge in Virginia since 2004, has previously ordered that criminal defendants be shackled during their jury trial. Tr. 14-15. In his courtroom, a defendant is shackled only in circumstances where he and/or the sheriff are concerned for courtroom security and safety, specifically when there was a risk of bodily harm. Tr. 15, 17. After such a determination is made, Judge Sharrett always places a colloquy on the record, so that the reasons for the shackles are known and maintained. Tr. 15, 19. Additionally, Judge Sharrett testified that in the past, he presided over jury trials where defense attorneys, and even Mr. Clary himself, would request that the defendant appear in shackles, out of concern for his own safety as an individual confined to a wheelchair. Tr. 47-48; *cf.* Tr. 96 (Mr. Clary could not specifically recall whether he had requested shackles for a client in a jury trial before). In that instance, as in instances where the sheriff or Judge Sharrett initiates the shackling of the defendant, Judge Sharrett would place the request on the record, have the defense attorney state reasons for the request, and then rule on the request and give his rationale. *Id.*

Moreover, when a defendant is shackled during a jury trial, Judge Sharrett goes to great lengths to make sure the jury does not see the shackles. Tr. 18. For instance, the defendant will always enter the courtroom from the holding cell before the jury is seated, and the defendant will

always leave the courtroom after the jury has exited. Tr. 19. While at counsel's table, Judge Sharrett also attempts to make sure the shackles are not visible. *Id.* In the courtroom where Davis was tried, counsel's table has a front panel, but open sides. Tr. 23. Lastly, if the defendant testifies, Judge Sharrett always takes a recess before and after, without letting the jury know why, so that the defendant can walk in and out of the witness box without the jury seeing the shackles. Tr. 19-20.

Specifically with regard to Davis' trial, in preparation for his testimony, Judge Sharrett reviewed the record and transcript of the trial. Tr. 24. Judge Sharrett could not recall whether Davis appeared in court wearing leg shackles. Tr. 24-25 ("I don't recall. I don't recall from direct evidence. I cannot in my mind's eye envision a shackled or an unshackled defendant in that case. It's five years ago."). However, because the record was devoid of any discussion of shackles, or any evaluation of the need for shackles, and because Jude Sharrett is familiar with the processes and procedures he typically uses when shackling a defendant, he presumed that Davis was not shackled. Tr. 25-26. Moreover, when specifically reviewing the transcript for the moment Davis testified, Judge Sharrett noted that there was no recess, either before, or after, Davis' testimony, and therefore, because he has never had a shackled defendant take the stand in the presence of the jury when the shackles would have been visible, it was a strong circumstantial indication to him that Davis was not shackled. Tr. 30.

Sussex County Sheriff Raymond Bell, who brought Davis in and out of the courtroom and was responsible for Davis' security during the trial, remembered there being no reason why Davis should have been shackled; he was not disruptive, did not constitute a flight risk, nor did he pose a danger of bodily harm. Tr. 52-53. Sheriff Bell did not have a specific recollection

whether Davis was shackled during his jury trial,[17] but stated the normal practice was that defendants were not shackled during jury trials. Tr. 56-57. Similarly, lead prosecutor Lyndia Ramsey had no specific recollection of Davis wearing shackles, and could not see Davis wearing shackles in her mind's eye. Tr. 75. However, it is her practice to raise the issue with the trial judge if the defendant is shackled and it has not yet been addressed. Tr. 77. Likewise, Mr. Clary had no specific recollection of Davis wearing shackles at trial, and he never raised an objection to Davis wearing shackles. Tr. 90. However, had shackles been brought to his attention, Mr. Clary would have raised the issue with the trial judge. Tr. 94.

On the other hand, three witnesses, including Davis, affirmatively and specifically recollected that Davis was wearing shackles around his ankles during the trial in front of the jury. First, juror "G.C." saw Davis in shackles when he came into the courtroom after jury selection was complete and during the guilt phase of the trial, and she saw them every time she saw his legs, based on the way he was walking. Tr. 99-101. The shackles stood out to juror G.C. because it was the first time she ever had jury duty with a case involving someone wearing shackles. Tr. 103. However, she could not specifically recall the moment when Davis took the witness stand to testify, and whether she saw shackles at that moment. Tr. 101.

Second, juror "E.O." also specifically remembered one instance when he saw Davis wearing the shackles during the trial while Davis was sitting at the defense counsel's table. Tr. 105-106. Specifically, juror E.O. testified to a conversation in the jury room that was heard by all of the jurors, Tr. 111, when one juror made the comment that Davis "was a nice looking gentlemen," to which another juror responded by saying, "he is not nice from the legs - - or from the ankles down." Tr. 107. After hearing this conversation, when the jury returned to the

---

[17] During cross-examination, Sheriff Bell affirmatively stated that Davis was not shackled during trial. Tr. 57. However, after clarification by the Court, Sheriff Bell relented that he did not have a specific memory, but to the best of his knowledge, based on typical practice, Davis did not have shackles on. Tr. 60-62.

courtroom, juror E.O. specifically remembers looking at Davis' legs and seeing the shackles when the trousers were raised. Tr. 106. However, like juror G.C., juror E.O. could not specifically recall other occasions during trial when he saw Davis in shackles. Tr. 112.

Lastly, Davis himself testified in his affidavit and during the evidentiary hearing that he wore leg shackles during his jury trial, from voir dire through the entirety of the trial. Tr. 117. Davis wore the shackles from the time he left the jail, during transport in the van, and when he walked into the courthouse and eventually the courtroom. Tr. 122. When it was his time to testify, Davis believed that the bailiff asked whether he should testify at counsel's table or in the witness box because he was wearing shackles. Tr. 118. This dialogue between the bailiff and Mr. Clary is reflected in the trial transcript, and during the evidentiary hearing, Judge Sharrett speculated that the bailiff asked Mr. Clary that question because the bailiff was not familiar with jury trials. Instead, she had been in court for bail hearings, revocation hearings, and bench trials, where defendants regularly testified from the counsel's table. Tr. 43-45.

Based on the foregoing evidence, the Court would **FIND** that Davis was shackled during his trial in view of the jury without a specific or justified reason. The testimony of Judge Sharrett, Sheriff Bell, prosecutor Ramsey, clerk of court Gary Williams, and attorney Clary fails to establish definitively whether or not Davis was shackled during trial. Rather, initially, based on their testimony alone, the Court would be left to conclude that there was insufficient evidence to establish that Davis was shackled. Indeed, Judge Sharrett testified as to routine practice and procedure regarding shackling defendants during jury trials in his courtroom, and because of that practice, he could circumstantially conclude that based on the lack of any colloquy regarding shackling in the trial transcript, that Davis was not shackled. However, the testimony of those individuals is not the only evidence before the Court. The testimony from these three additional

witnesses—juror G.C., juror E.O, and Davis—all of whom have a specific recollection of the fact, unlike the other witnesses, establishes that Davis was shackled in view of the jury during his trial. The two jurors specifically remember instances during trial when they saw Davis wearing leg irons.[18] Juror E.O. remembered other jurors discussing the leg irons in the jury room. Davis himself testified that he was shackled for the entire trial. While the testimony of Judge Sharrett, Sheriff Bell, prosecutor Ramsey, clerk Williams, and attorney Clary failed to specifically establish that Davis was not shackled, the certain testimony of juror G.C., juror E.O., and Davis established that Davis was shackled. Additionally, as Sheriff Bell testified, there was no extenuating circumstance or reason for Davis to be shackled, i.e., he did not present a danger of bodily harm or risk of flight. Therefore, the Court would **FIND** that Davis was wearing leg irons, or shackled, during his trial and in view of the jury without a particular reason or purpose.[19]

### B. Davis' defense counsel, Mr. Clary, did not object to Davis wearing shackles.

In short, based on the trial transcript and the evidentiary hearing, it is clear that at no point during the trial did Mr. Clary object to Davis wearing shackles. Mr. Clary affirmatively testified during the evidentiary hearing that he did not object to Davis wearing shackles, and that he did not specifically remember if Davis asked him to object. Therefore, the Court would **FIND** that Davis' defense counsel, Mr. Clary, did not object to Davis wearing shackles during his trial in view of the jury.

---

[18] Prior to the evidentiary hearing, the parties stipulated that the remaining jurors had no knowledge or recollection of Davis being shackled. ECF No. 44.

[19] By making this finding the Court does not mean to suggest that the Commonwealth's witnesses were not candid with the Court. Rather, they all testified that they did not recall Davis being in shackles during trial, and assumed, based on general practice, that he must not have been. Thus, the most likely explanation is that these witnesses, unlike the members of the jury and the defendant himself, simply did not notice the shackles. Regardless, the persuasive evidence before the Court establishes that Davis was shackled during the trial, and that he was observed by the jury in such a state.

**C. The conflicting evidence produced at trial required the jury to make credibility determinations.**

Judge Sharrett and prosecutor Ramsey testified that the evidence against Davis was "overwhelming." *See* Tr. 35-36 (Judge Sharrett); Tr. 71-72, 77-78 (Prosecutor Ramsey); *cf.* Tr. 83 (Mr. Clary: "Mr. Davis' defense was that he accidently struck the decedent in the mouth with his elbow and that when he left the scene she was very much alive. That could not be reconciled with the evidence that the Commonwealth put forward."). However, the witnesses also testified that the case ultimately came down to credibility, and the jury had to discredit Davis' testimony, or find him less credible than the police officers, to find him guilty. Tr. 37-39 (Judge Sharrett acknowledging that Davis never admitted guilt); Tr. 72 (Prosecutor Ramsey acknowledging that credibility was an issue in Davis' trial, just as it is in every trial); Tr. 83 (Mr. Clary: "So it was a question of whether or not – in my mind it was to a great extent a question of whether or not the Commonwealth's witnesses were truthful."). It was even acknowledged that had the jury believed Davis' testimony on the witness stand, the jury's only choice would have been an acquittal, or perhaps one of the lesser included offenses available on the jury form. Tr. 40 (Judge Sharrett). Mr. Clary testified that Davis' trial ultimately came down to whether the jury believed Davis' testimony at trial, or whether the law enforcement officials were being truthful and whether the jury believed them over Davis. Tr. 83-84, 97. Lastly, Mr. Clary believed that his motions to strike the Commonwealth's evidence and his motion to set aside the verdict were well-taken. Tr. 89. Accordingly, the Court would **FIND** that evidence produced at trial required the jury to make credibility determinations regarding the law enforcement officials' testimony and Davis' testimony.

With these three proposed findings of fact in mind, the Court will now address Davis' shackling claim and the remaining claims in his habeas petition.

## IV. DISCUSSION

Davis raises eleven total claims in the federal habeas petition now before the Court. As discussed above, the Court first reviews Davis' shackling claim de novo, and then reviews the remaining ten claims under the deferential standard prescribed by AEDPA.

### A. Davis' Shackling Claim – Ineffective Assistance of Counsel

Under Claim D in his petition, Davis alleges: "In violation of the 6[th] and 14th Amendments to the United States Constitution and Article I Section 8 of the Virginia Constitution, Petitioner was denied his constitutional right to effective assistance of counsel based on the following: counsel's failure to object to Petitioner being forced to wear shackles during the guilt and sentencing phase of trial." ECF No. 2 at 17-20. Specifically, Davis claims that he was forced to walk in shackles on the first and second day of trial while being brought into the courtroom, and that the shackles were visible to the jury while he was sitting at counsel's table. *Id.* at 18. Davis also claims that he "vehemently insisted that counsel object to the shackling and have the shackles removed," but that Mr. Clary ignored his request and refused to make any objection. *Id.*

As an initial matter, the Court would **FIND** that Davis' burden of proving both the performance and prejudice prongs under *Strickland v. Washington* does not include the burden of proving that he asked, or told, Mr. Clary to object to the shackles. In fact, that is not even the explicit language of Davis' claim. Rather, Davis' claim is that Mr. Clary was ineffective under the Sixth Amendment for "fail[ing] to object to Petitioner being forced to wear shackles . . . ." ECF No. 2 at 17. The Respondent attempts to include this notice element as a part of Davis' prima facie case without persuasive support. *See* ECF No. 50 at 14 ("At the outset, petitioner has failed to carry his burden to show Davis was shackled during trial, that the jury saw him shackled

31

during trial, *that he told his attorney he was shackled* and that his attorney refused to object to his shackling.") (emphasis added). Imposing an affirmative duty on a criminal defendant to prove that he attempted to request, or that he attempted to tell his attorney to perform in a sufficient or effective manner would produce absurd results.

For instance, consider the following cases, where the Court ultimately determined that defense counsel's performance was deficient. *See, e.g., United States v. Luck,* 611 F.3d 183, 188-89 (4th Cir. 2010) (finding defense counsel's performance deficient in failing to request 'informant instruction' in drug conspiracy prosecution, where informants were paid for their testimony and there was little corroborating evidence beyond their testimony); *Griffin v. Warden,* 970 F.2d 1355, 1358 (4th Cir. 1992) (determining that counsel's failure to contact robbery defendant's alibi witnesses and notify the prosecutor of an alibi defense constituted deficient performance); *Merzbacher v. Shearin,* 732 F. Supp. 2d 527, 561 (D. Md. 2010) (finding a lawyer fails to provide effective assistance when she fails to inform her client of a plea offer), *rev'd on other grounds,* 706 F.3d 356 (4th Cir. 2013). Under *Strickland,* to demonstrate deficient performance, the criminal defendant was not required to prove that he asked his attorney to request the "informant instruction" in *Luck,* nor was the criminal defendant required to prove that he asked his attorney to notify the prosecutor of his alibi defense or told him to contact the alibi witnesses and make sure they appear to testify in *Griffin.* And it simply cannot be required that the criminal defendant in *Merzbacher* prove that she asked her attorney to inform her of all plea offers from the government.

Adding this additional notice requirement to the already significant burden under *Strickland* would make proving ineffective assistance of counsel—already no easy feat— practically insurmountable. It also weakens the criminal defense attorney's ethical obligation to

zealously represent his or her client, and imposes additional burdens and knowledge of the intricacies of criminal procedure on criminal defendants. *See Vasquez v. Bradshaw*, 345 F. App'x 104, 116 n.2 (6th Cir. Sept. 2, 2009) (unpublished) ("While we are sympathetic to the defense attorney who has a client that will not help, we do not believe our cases to support the proposition that a defendant gets only the defense that he is capable of providing personally.") Therefore, the Court will not consider whether Davis asked Mr. Clary to object to the shackles in the *Strickland* analysis.

Generally, to succeed on an ineffective assistance of counsel claim, Davis must show that, first, Mr. Clary's performance was deficient, and second, that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). For the reasons more fully discussed below, the Court would **FIND** that based on the evidence before the Court, Davis' defense was prejudiced by Mr. Clary's deficient performance, and thus, Davis satisfied his burden under *Strickland*.

1. Mr. Clary's failure to object to Davis wearing shackles constitutes deficient performance.

As discussed in the previous section, the Court would find that Davis was shackled during his trial in view of the jury without a specific need or reason to be shackled, and that Mr. Clary did not object to Davis being shackled. Accordingly, with these two facts established, the first issue under the *Strickland* analysis becomes whether counsel's failure to object to his client wearing shackles in view of the jury constitutes constitutionally defective assistance under the Sixth Amendment. The undersigned would find that it does.

Criminal defendants are entitled to "reasonably effective assistance" under the Sixth Amendment. *Id.* The defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "Courts indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance in order to avoid the distorting effects of hindsight." *United States v. Ray*, No. 13-6471, 2013 WL 6354145, at *3 (4th Cir. Dec. 6, 2013) (citing *Burt v. Titlow*, 134 S. Ct. 10, No. 12-414, 2013 WL 5904117, at *6 (Nov. 5, 2013)). In the absence of a special need, "[t]he law has long forbidden routine use of visible shackles during the guilt phase" of a criminal defendant's trial. *Deck v. Missouri*, 544 U.S. 622, 626 (2005). When a criminal defendant appears before the jury in shackles, it implicates three fundamental legal principles. *Id.* at 630-31. First, visible shackling undermines the presumption of innocence afforded to the criminal defendant, i.e., he must be separate and the community must be protected from him. *Id.* at 630-31. Second, shackling diminishes a criminal defendant's right to counsel by impeding his ability to communicate or participate in his own defense. *Id.* at 631. Third, shackling a criminal defendant tarnishes the dignity of the judicial process and the respect afforded to the defendant. *Id.* at 631-32. In fact, when shackles are used without special justification, it is a *per se* due process violation, because the use of shackles is 'inherently prejudicial' to the criminal defendant. *Id.* at 634-35 ("[W]here a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation.").

Accordingly, here, Mr. Clary failed to object to a *per se* violation of Davis' due process rights. Even if such an objection would have been futile, and the court would have required Davis to remain shackled (of which there is no evidence in the record), defense counsel still had an obligation to raise the issue with the court. *United States v. Calhoun*, No. 10-986, 2013 WL 754431, at *5 (E.D. Pa. Feb. 28, 2013). Alternatively, if Mr. Clary simply failed to notice that Davis was shackled, this oversight also constitutes deficient performance. *Cf. United States v.*

34

*Rusmisel*, 716 F.2d 301 (5th Cir. 1983) (finding defense counsel's performance deficient for failing to object to improper questioning of witnesses by prosecutor, when the resulting witness testimony was so prejudicial as to render the trial fundamentally unfair). Therefore, the Court would **FIND** that Mr. Clary's failure to object to Davis wearing shackles in front of the jury without adequate justification constitutes deficient performance under *Strickland*.

<u>2. Davis was prejudiced by Mr. Clary's deficient performance.</u>

Because Davis raised this claim as ineffective assistance of counsel, Davis still has the burden of proving that Mr. Clary's failure to object to the shackling prejudiced his defense. Of note, had the posture of this case been slightly different and the claim was raised as a due process violation—assuming counsel did object and the trial court still required Davis to appear in shackles without adequate justification—it would have been the Respondent's burden to prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained." *Deck*, 544 U.S. at 635 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also Calhoun*, 2013 WL 754431 at *5 ("As stated, shackling is 'inherently prejudicial,' and in the usual case, a defendant need not demonstrate prejudice to make out a due process violation. However, because Calhoun raises his argument as an ineffective assistance of counsel claim, a finding of prejudice is required."). In other words, it is still Davis' burden to prove the second prong of the *Strickland* analysis.

Under *Strickland*, Davis must show "that there is a reasonable probability that, but for counsel's unprofessional errors [i.e. failing to object to the unjustified shackling], the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Because Davis is challenging his conviction, he must show that there is a reasonable probability that the jury

"would have had a reasonable doubt respecting guilt." *Id.* at 695. This is not to be confused with a reasonable probability of acquittal. Rather, Davis "is required to demonstrate a reasonable probability of a different outcome—a somewhat lower burden for a defendant." *Walker v. Hoffner*, 534 F. App'x 406, 412 (6th Cir. Aug. 16, 2013) (unpublished) (finding other possible outcomes other than an acquittal to include a hung jury, or a verdict of guilty by reason of mental insanity, both of which would have been better outcomes for the petitioner, who was convicted of first-degree murder). Ultimately, the Court must assess whether Davis was prejudiced because of a breakdown in "the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 698 ("In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.").

Here, as discussed above, there were six different possible verdicts that the jury could have chosen at the conclusion of the guilt phase of Davis' trial. *See supra* sec. III. Accordingly, Davis is required to prove that but for Mr. Clary's failure to object to Davis wearing shackles in view of the jury, there is a reasonable probability that the jury would have arrived at a different verdict, or that the jury would not have reached a unanimous verdict, resulting in a hung jury and mistrial. In determining whether a different outcome was reasonably probable—meaning more than "conceivable" but less than "more likely than not"—the Court must look to the nature of Mr. Clary's error and the totality of the evidence before the jury. *Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). The Commonwealth argues that the evidence against Davis "was overwhelming." ECF No. 50 at 32. Davis argues that

because the nature of the error was egregious, and because the evidence against him was not overwhelming but instead required multiple credibility determinations, there was a reasonable probability that the jury would have arrived at a different verdict. ECF No. 49 at 13-25. The undersigned would agree with Davis.

First, as discussed earlier under *Strickland's* first prong, the nature of the error is glaring—in fact, allowing a criminal defendant to appear in shackles without justification has been labeled by the United States Supreme Court as a *per se* due process violation. *See Deck* 544 U.S. at 634-35. Most notable here is the possible impact appearing in shackles had on the presumption of innocence afforded to Davis as the criminal defendant, as illustrated by the statements made by jurors. *Deck*, 544 U.S. at 630 (citing *State v. Roberts*, 206 A.2d 200, 202 (N.J. Super. App. Div. 1965) ("[A] defendant 'ought not be brought to the Bar in a contumelious Manner; as with his Hands tied together, or any other Mark of Ignominy and Reproach . . . unless there be some Danger of a Rescous [rescue] or Escape . . . .'") (quoting 2 W. Hawkins, Pleas of the Crown, ch. 28, § 1, at 308 (1716-1721) (section on arraignments))). First, juror E.O. testified about a conversation between two jurors in the jury room that could be heard by all jurors. Tr. 107, 111. "One of the jurors made the comment that Mr. Davis was a nice looking gentleman. And there was another [juror] that said well he is not nice from the legs - - or from the ankles down." *Id.* Even if, at this point in time, the remaining jurors had not yet noticed the shackles, they were now all presumably aware that Davis was shackled. The jurors were therefore also aware of the suggestion "that the justice system itself sees a 'need to separate [Davis] from the community at large.'" *Deck*, 544 U.S. at 630 (citing *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986)). Indeed, after hearing this conversation in the jury room, juror E.O. testified that when he returned to the courtroom, "I looked and when his legs - - when he moved his legs to a point

where his trousers would raise slightly, you could see the leg irons." Tr. 106.

And even though juror G.C. and juror E.O. were not "surprised" to see Davis wearing shackles—because after all "murder is a serious crime. It's, you know, it's not like he stopped at 7-Eleven and lifted a pack of gum. I consider murder to be a violent offense." Tr. 110—whether they believe in their minds that they gave Davis a fair trial and remained impartial, Tr. 103, 109, as jurors, the appearance of shackles altered their perception of Davis, and in effect, rebutted the presumption of innocence he is constitutionally afforded. *Cf. Deck*, 544 U.S. at 633 (finding that appearing in shackles "inevitably undermines the jury's ability to weigh accurately all relevant considerations—considerations that are often unquantifiable and elusive—when it determines whether a defendant deserves death . . . [also holding that this applies just as equally, if not more so, during the guilt phase]."). It is for this very reason that the United States Supreme Court considers shackling a criminal defendant to be "inherently prejudicial." *Deck*, 544 U.S. at 635 (citing *Holbrook*, 475 U.S. at 568) ("[T]he practice will often have negative effects, but—like 'the consequences of compelling a defendant to wear prison clothing' or of forcing him to stand trial while medicated—those effects 'cannot be shown from a trial transcript.'") (quoting *Riggins v. Nevada*, 504 U.S. 127, 137 (1992)). Accordingly, the undersigned would **FIND** that the serious nature of counsel's error weighs in favor of determining that Davis was prejudiced as a result. *Accord Stephenson v. Wilson*, 629 F.3d 732, 738-39 (7th Cir. 2011) (Rovner, J., Williams, J., & Hamilton, J. dissenting) (additional citations omitted) (finding that requiring a criminal defendant to appear in shackles or similar restraints without justification "is a pervasive error, in that it affects the whole trial, the jury's perception of the defendant, and such fundamental aspects of the prosecution as the presumption of innocence . . . [and while the error] might not alter the outcome of the trial, as when the proof of guilt is overwhelming . . . it remains

prejudicial in the sense that *Deck* and *Holbrook* discuss prejudice . . . . The *Strickland* prejudice inquiry must begin with that recognition."). With this initial recognition of prejudice in mind, the Court reviews the strength of the evidence in Davis' trial.

> *i. It is reasonably likely that the outcome of Davis' trial would have been different absent counsel's errors, because the error directly impacted Davis' credibility on the witness stand, and the trial outcome was dependent on the jury's credibility determination of Davis and the Commonwealth's witnesses.*

The jury's verdict was dependent on their rejection of Davis' credibility and acceptance of the credibility of the Commonwealth's witnesses. Had the jury believed Davis' testimony in full, they would not have been able to find him guilty of first degree murder. The question then becomes, was the testimony of the Commonwealth's witnesses so credible that Davis' testimony was not worthy of credence regardless of whether he was shackled? The Court would find that it was not.

The evidence against Davis was not overwhelming, and depended in large part on the jury's credibility determination for each witness: the law enforcement officers—Giles, Gwaltney, and Diggs—who testified regarding statements Davis made to them; James Reece, the inmate who shared a cell with Davis for a month and testified that he had confessed to him; and lastly, Davis himself.[20] First, in finding Davis guilty, the jury made a credibility determination between Davis' testimony, and the testimony of the law enforcement officers, giving more weight to the latter. Indeed, one of the main arguments the Commonwealth made during closing argument at trial was that the jury cannot, and should not, trust Davis or his testimony from the witness stand. *See* Trial Tr. at 502 ("He's gotten on the stand today and told you a story. But the Commonwealth submits that you cannot believe what he said today. . . . But the story is not

---

[20] The Commonwealth also elicited testimony from Dowell's four friends, which was admitted for Dowell's state of mind purposes only, and not for the truth of the matter asserted in that testimony.

believable. It's so incredible and unbelievable that it just doesn't even make sense. Now why can't we believe Ryan Davis? Because he hasn't told you the truth. Now how do we know he hasn't told us the truth? Because he's told several different stories before. In fact he told five."). However, the premise of this argument requires the jury to believe the law enforcements officials' testimony in January 2008 accurately captured Davis' prior four statements at the time he gave them in June 2006. Upon subsequent review, this premise is harder to accept.

None of Davis' statements were videotaped or audiotaped by the law enforcement officials. And only Captain Gwaltney contemporaneously took notes[21] during Davis' First and Third Statements, while the two were alone in Gwaltney's office. Captain Gwaltney testified that the first interview with Davis lasted an hour and forty minutes,[22] while the second interview (Davis' Third Statement) lasted a little over two hours (from 5:10 p.m. to 7:25 p.m., as testified to by Gwaltney), for a total of almost four hours of interviewing. Ultimately, after four hours, Gwaltney only produced one page of notes, front and back, on which he relied during his testimony at trial.[23] Notably, the first three statements Davis gave were on the afternoon or evening of June 13, 2006, while the fourth occurred just over a week later on June 21, 2006 while he was in the Sussex County jail. Davis' trial did not take place until January 10, 2008, almost a year and a half after Davis gave those original statements. The only documentation that memorialized Davis' statements as perceived by law enforcement, and ultimately, as credited by the jury, was one page front and back of notes taken by Gwaltney, and notes taken by Diggs six

---

[21] Giles did not take notes during or after Davis' Second Statement, nor did Captain Williams, who was also present for the Second Statement (but did not even testify at trial), and Diggs took notes about six hours after he took Davis' Fourth Statement from the Sussex County jail.

[22] This timeframe was contradicted by Sergeant Giles, who was outside of Gwaltney's office in the booking area, and testified that the two were in Gwaltney's office anywhere from forty-five (45) minutes to an hour and fifteen minutes.

[23] This page of notes was included in the state court records as an exhibit that was used during the suppression hearing.

hours after meeting with Davis. The rest was left to the memory of the law enforcement officials. On their face, and not due to any bad faith, coercion, or fault by law enforcement officials, the accuracy of their recollection Davis' statements could be called into question.

Second, aside from Davis' First Statement—when Davis allegedly did not admit to being at Dowell's house that night—the next three statements he made to law enforcement and his testimony at trial were generally consistent regarding his interaction with Dowell the evening before her body was found. In general, Davis knocked on the door, Dowell let him in while wearing a night garment and talking on the phone. They went to the back bedroom, where they proceeded to engage in foreplay, but ultimately, Davis became disinterested and the two got into a disagreement, and when Davis attempted to leave, Dowell grabbed Davis or jumped on his back, scratching him in the process. At the same time, Davis elbowed Dowell in her face, causing her nose to bleed. Davis left Dowell's house while she cursed at him, he stole her car, and eventually left it at the local swimming pool parking lot. At trial, testifying in his own defense, Davis testified to a similar version of events, although this time, he omitted the part about taking Dowell's car and put himself at Dowell's house earlier in the evening around 8:30 p.m., instead of around midnight like the previous statements as testified to by law enforcement. Davis also concluded his testimony by claiming that all of the law enforcement officers were lying. Lastly, it is notable that throughout the statements and during his testimony at trial, Davis never admitted involvement in or causing Dowell's death.

Ultimately, the Court is left with the undeniable fact that the jury had to make credibility determinations between the testimony of Davis and law enforcement officials, which was inconsistent. Even though it might not have been an explicit or a conscious decision by the jurors, it was likely much easier for them to believe the testimony of witnesses wearing a badge,

than the testimony of Davis, who was wearing shackles. Moreover, any inconsistencies in the statements as described by law enforcement officers were argued to be inconsistencies attributed to Davis, for telling a different story each time, yet there was no evidence, other than one two-sided page of notes, that accurately reflected his statements, other than the testimony of the officers. Moreover, the Commonwealth framed the testimony as all or nothing; in other words, if the jurors were to believe Davis, or portions of Davis' testimony, then they would also have to believe the officers were lying. In the Commonwealth's rebuttal, the assistant prosecutor gave the jurors an ultimatum, which only emphasized the role that credibility played in this trial:

> If you believe Ryan Davis, send him out that front door right there, home or wherever, if you believe him as he sits there and tells you what he testified to in court. But now keep in mind, if you believe him, all the police that have testified are lying. And their notes and their experience and their training and their sworn profession is out the window, because they're here lying on him, okay?

Trial Tr. 522-23. Davis not only lost his presumption of innocence when he appeared in front the jury wearing shackles, but he lost credibility as well, when the alternative result would have required the jury to not only credit Davis' testimony, but also discredit the officers' testimony in their "sworn profession." Because the credibility of witnesses was so central to this case, the undersigned would find that appearing in shackles prejudiced Davis' defense, in light of the deficiencies with the law enforcement testimony, as discussed above.

Similarly, the testimony of Davis' cellmate, James Reece, might be questioned because at the time he offered the information, he was in the jail with pending charges in the same jurisdiction as Davis. *Sivak v. Hardison*, 658 F.3d 898, 916 (9th Cir. 2011) ("'Defendants or suspects with nothing to sell sometimes embark on a methodical journey to manufacture evidence and to create something of value, setting up and betraying friends, relatives, and cellmates alike.'") (quoting *Commonwealth of N. Mariana Islands v. Bowie*, 243 F.3d 1109,

1124 (9th Cir. 2001)). There is no evidence that Reece entered into any agreement with the prosecution in exchange for his testimony, or that Reece knew he would receive more favorable treatment if he testified against Davis. This fact might call into question the reliability of his testimony. *United States v. Bagley*, 473 U.S. 667, 683 (1985) (finding that the lack of a binding contract or promise for certain benefits could incentivize a witness to lie). Moreover, Davis attempted to impeach Reece's credibility by testifying that in their shared cell, Reece had access to the preliminary hearing transcript, which included facts that comprised the Commonwealth's theory of the case, which closely mirrored Reece's testimony. Therefore, the Court would also find that Reece's testimony does not overwhelming support the jury's verdict.

Overall, the jury was required to weigh the credibility of law enforcement officials, Dowell's friends, Reece, and Davis. The prosecutors even explicitly suggested to the jury that they could not credit Davis without believing that the law enforcement officials were lying. However, the accuracy of the law enforcement officials' testimony might reasonably be questioned due to the lack of corroboration through documentation. Accordingly, the Court would **FIND** that the witness testimony in this case did not overwhelmingly support the jury's verdict.

### ii. *The physical evidence did not overwhelmingly support the jury's verdict.*

The physical evidence presented at trial was also not overwhelming; in fact, if Davis' theory of the case is credited, it tends to corroborate Davis' version of the events. First, and most notably, the medical examiner could not determine a cause of death for Dowell, who was obese and had minor heart problems at the time of her death. In her report, the medical examiner concluded that "[d]ue to the blunt force injuries, homicidal violence is a distinct possibility." However, during trial, the medical examiner testified the blunt force injuries were not considered

43

fatal injuries to Dowell.

Second, the DNA evidence was also not overwhelming. Davis could not be excluded from DNA found under Dowell's fingernails, which is consistent with her scratching him. And Dowell could not be excluded from DNA found on Davis' sweatshirt, which would be consistent with the blood from her nosebleed. Moreover, whether there was an insufficient sample or not, the Commonwealth never tested the clump of hair found in Dowell's left hand, and the hairs found on her chest. Left unanswered is the question as to where the hair came from. The Commonwealth admitted photographs into evidence during trial that show Davis was bald on June 13, 2006. Because DNA from the hair was never compared to DNA from Dowell or Davis, the origin of the hair is left to speculation. Regardless, the unanswered questions lead the Court to conclude that the physical evidence in the record did not overwhelmingly support the jury verdict.

Lastly, the Commonwealth argued that the photographs of the crime scene show that a struggle took place in Dowell's house. While that could be true, the photographs also depict a house with trash, paper, and clothes everywhere, leaving it difficult to conclude that the sole cause of the disarray was a physical struggle. Accordingly, the physical evidence alone does not indicate overwhelming support for the verdict, but instead leaves the Court with more questions than answers. Accordingly, the Court would **FIND** that the physical evidence did not overwhelmingly support the jury's verdict. Moreover, based on the foregoing discussion of the cumulative evidence produced at trial, because the verdict did not have "overwhelming support" in the record, the Court would **FIND** that, because of the detrimental impact to his credibility, Davis was prejudiced by counsel's failure to object to Davis wearing shackles in front of the jury without justification. *Strickland*, 466 U.S. at 698 ("[A] verdict or conclusion only weakly

supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

> *iii. There is a reasonable probability that but for failing to object to the shackling, the outcome of the proceeding would have been different.*

In arriving at this determination, the Court is guided by the principle discussed in *Strickland* that requires courts to assess the overall "fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 698. The Court cannot say, after determining that Davis was required to appear at trial wearing shackles in front of the jury, that Davis' trial was fundamentally fair, but instead, must recognize that a "breakdown [occurred] in the adversarial process that our system counts on to produce just results." *Id.* To be clear, in reviewing the trial transcripts, the state court records, and the evidence admitted at trial, the Court is not re-weighing the evidence against Davis and determining guilt or innocence. Instead, under *Strickland's* prejudice prong, the Court is only concerned with the probability of a different outcome, based on the overall fairness of the trial. *See Walker v. Hoffner*, 534 F. App'x 406, 412 (6th Cir. 2013) (unpublished) (citing *Woodford v. Visciotti*, 537 U.S. 19, 22-24 (2002)) (additional citations omitted).

The probability of a different outcome must be reasonable. In *Strickland*, the Supreme Court provided the following guidance: "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The Court elaborates upon this standard by requiring that, on the one hand, the errors had more than "some conceivable effect on the outcome," but on the other hand, the errors need not have "more likely than not altered the outcome." *Id.* at 693. Davis urges the Court to adopt the standard announced by the U.S. Court of Appeals for the Seventh Circuit in *Canaan v. McBride*, 395 F.3d 376, 386 (7th Cir. 2005): "Even if the odds that the defendant would have been acquitted had he received effective

45

representation appear to be less than fifty percent, prejudice has been established so long as the chances of acquittal are better than negligible." ECF No. 49 at 4-5. The Respondent discourages the Court from assigning a percentage to this standard and instead advocates the use of the often quoted phrase: "whether there is a reasonable probability that, absent the errors, the factfinder would have had reasonable doubt respecting guilt." ECF No. 50 at 12 (citing *Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994) (quoting *Strickland*, 466 U.S. at 695)). The Court declines the invitation to assign a value to the "reasonable probability" standard.

Instead, the Court is instructed by the language in *Strickland*, that a reasonable probability of a different outcome is somewhere between "conceivable" and "more likely than not" based on counsel's error. When the Court finds that a verdict is not overwhelmingly supported by evidence in the record, *Strickland* informs us that counsel's error is more likely to have prejudiced the defendant. Here, on the face of the verdict form, there were six potential verdicts: (1) guilty of first degree murder after having been twice convicted of a violent felony; (2) guilty of first degree murder; (3) guilty of second degree murder after having been twice convicted of a violent felony; (4) guilty of second degree murder; (5) guilty of assault and battery; or (6) not guilty. There was also the possibility of a hung jury resulting in a mistrial, *see Walker*, 534 F. App'x at 412, which means there were seven total possible outcomes of Davis' trial. When viewing the possible outcomes, after considering the evidence against Davis, the Court would conclude that there is a reasonable probability, meaning it is more than just conceivable, that the outcome would have been different, had counsel effectively objected to Davis wearing shackles.

For instance, it is reasonably probable that the jury could have credited portions of Davis' testimony and concluded that Davis still might have intentionally killed Dowell, but that the

killing was not willful, deliberate and premeditated, therefore finding him guilty of second-degree murder after having been twice convicted of a violent felony.[24]  It is also reasonably probable that, had the jury completely credited Davis' testimony, the verdict could have been not guilty, or at most, guilty of assault and battery for elbowing Dowell.  Lastly, had one single juror credited the testimony of Davis in whole or in part, against the beliefs of all other jurors, the outcome could have been a mistrial.  Again, the Court would reach this conclusion because of the finding that the "fundamental fairness" of the proceeding was tainted due to Davis appearing in shackles in view of the jury.  Thus, the reliability of the outcome of the proceeding cannot be trusted and must be called into question, because of counsel's error in failing to object to Davis wearing shackles.  In this instance, "the adversarial process that our system counts on to produce just results" broke down.  *Strickland*, 466 U.S. at 698.

Based on the foregoing reasons, there is a reasonable probability the outcome of Davis' trial would have been different in the absence of counsel's error.  Therefore, the Court would **FIND** that defense counsel was ineffective for failing to object to Davis wearing shackles without justification during trial in front of the jury, and the prejudice to Davis warrants a new trial.  *Accord Calhoun*, 2013 WL 754431 at *7.

### B. Davis' Remaining Claims

The Court now reviews Davis' remaining ten claims under the deferential standard provided by AEDPA, because those claims were adjudicated on the merits by the Supreme Court of Virginia.  In nine of the claims—A, C, E, F, G, H, I, J, and K—Davis claims that his Sixth

---

[24] Davis' criminal record and two prior violent felonies were not in dispute.  The certified copies of Davis' prior convictions were admitted into evidence, and therefore that element of the case would not have been impacted by Davis' credibility.  In other words, had the jury found Davis intentionally killed Dowell without premeditation, they would have had no choice but to find him guilty of the enhanced charge of second-degree murder after having twice been convicted of violent felonies.  Therefore, the possible verdicts of solely "first-degree murder" and "second-degree murder," without the enhancement, are not plausible nor are they supported by the overwhelming evidence in the record.

Amendment right to counsel was violated for various reasons. In claim B, Davis claims his Fifth and Fourteenth Amendment rights were violated during his custodial interrogation on June 13, 2006 because the police continued the interrogation after he requested an attorney, and because statements he made during the interrogation were not voluntarily and knowingly made.

Again, in the context of Sixth Amendment right to counsel claims that have already been adjudicated on the merits and rejected by the state court, the United States Supreme Court has summarized the high bar petitioners then face in a federal *habeas* petition:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' [466 U.S. 668, 689 (1984)]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, *Knowles [v. Mirzayance]*, 556 U.S. [---, ---], 129 S. Ct. [1411, 1420 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ---, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Premo*, 131 S. Ct. at 740. With that standard in mind, the Court now reviews the reasonableness of the state court's application of federal law to Davis' remaining claims.

### 1. The Supreme Court of Virginia's application of *Strickland* to Davis' remaining claims was not unreasonable and those claims should be dismissed.

In claim A, Davis claims that Mr. Clary was ineffective because he failed to move to dismiss the case based on alleged violations of Davis' right to a speedy trial. In dismissing his state court habeas, the state court determined that this claim failed to satisfy both prongs under *Strickland*. ECF No. 17, attach. 2 at 2. Specifically, the state court found that the Davis' right to a speedy trial was not violated, based on transcripts from the suppression hearing and an affidavit from Mr. Clary, which stated that Davis, through counsel, agreed to continuances and waived his

48

right to a speedy trial. *Id.*; *see also* Suppression Hearing Tr. at 248 (Oct. 1, 2007) ("The Court: Okay. Mr. Davis, I need to know whether or not you're waiving your rights to a speedy trial? The Defendant: Yes, sir. Mrs. Ramsey: Your Honor, I need the record to be clear that he waives both statutory and constitutional rights. The Court: Both your statutory right and your constitutional right to speedy trial? The Defendant: Yes, sir. The Court: All right, having waived those rights to speedy trial the Court accepts that waiver on the record."). As such, the court concluded that Mr. Clary's performance was not deficient for failing to raise a futile motion, nor was Davis prejudiced as a result. The Court would **FIND** that this is reasonable application of *Strickland* to the underlying facts. *See Sharpe v. Bell*, 593 F.3d 372, 383 (4th Cir. 2010) ("Counsel is not required to engage in the filing of futile motions."). Therefore, the Court would recommend that claim A be dismissed.

Next, in claim C, Davis claims his Sixth Amendment right to counsel was violated because the trial court refused to grant his request for new counsel and trial counsel's motion to withdraw. Davis raised this claim on direct appeal, which was ultimately dismissed by the Supreme Court of Virginia. Even though Davis has a right to counsel under the Sixth Amendment, the state court determined that the trial court has sound discretion to grant such a motion for new counsel, and that Davis cannot replace his attorney without a showing of good cause. ECF No. 17, attach. 1 at 6. On the first day of trial, after Davis was arraigned, in determining whether Davis was entering a knowing and voluntary plea of "not guilty," Judge Sharrett asked Davis whether he was satisfied with the services of Mr. Clary. Trial Tr. at 4. Davis responded that he was not, because he alleged Mr. Clary had breached the attorney-client privilege, and that they had an irreconcilable conflict. *Id.* at 4-5 ("I just don't believe - - I can't trust him."). Judge Sharrett inquired further but ultimately denied Davis' request because he had

no facts to support the very serious allegation. *Id.* at 8. Moreover, Mr. Clary stated that he was prepared for trial and had spent over one hundred hours preparing for the case. *Id.* at 6. The state court determined on direct appeal that because Davis had no supporting facts to support his allegations, nothing in the record indicated that the trial court abused its discretion in denying Davis' motion. ECF No. 17, attach. 1 at 7. The Court would **FIND** the state court's determination reasonable, and therefore, recommends that claim C also be dismissed.

In claim E, Davis claims Mr. Clary was ineffective because he failed to object to the admission of the autopsy report, which allegedly stated an opinion as to an ultimate issue of fact. Specifically, Davis claims Mr. Clary should have objected to the medical examiner's opinion that the cause of death could not be determined, but that the blunt force injuries made homicidal violence a distinct possibility. The state court dismissed this claim because Davis failed to satisfy his burden under either prong of *Strickland*. ECF No. 17, attach. 2 at 3. Specifically, the Court found that because "[n]othing in the testimony or in the autopsy report went to the ultimate issue at trial, which was whether the petitioner murdered the victim," Mr. Clary was not ineffective for failing to raise a futile objection. The state record trial transcript reflects Mr. Clary's tough and effective cross-examination of Dr. Kay, the medical examiner. There is no evidence that the medical examiner's "opinion" was improper. Again, the Court would **FIND** that the state court's application of *Strickland* was reasonable, because Mr. Clary was not required to raise a futile motion, *Sharpe*, 593 F.3d at 383, and therefore recommends dismissal of claim E.

In claim F, Davis claims that Mr. Clary was ineffective because he failed to investigate and introduce evidence that would corroborate his innocence; specifically, two certificates of analysis and cell phone records. The state court dismissed this claim because Davis failed to

50

argue how this additional evidence would have helped his defense, and therefore, he failed to meet his burden under *Strickland*. ECF No. 17, attach. 2 at 4-5. This determination was not unreasonable. Again, Davis argues that he gave the evidence to Mr. Clary, but fails to state how that evidence would have "supported his factual innocence." Davis gave the state court no basis for how Mr. Clary's performance was deficient in this regard, and therefore, the Court would **FIND** that the state court's application of *Strickland* was not unreasonable, and recommends claim F be dismissed as well.

In claim G, Davis claims Mr. Clary was ineffective for failing to request a limiting instruction that his former cellmate James Reece's testimony "should not be considered for the truth of the matter." The state court dismissed this claim because it found that Reece's testimony was admissible under the party admission exception to the hearsay rule, and therefore, concluded that Mr. Clary was not ineffective to failing to raise this futile motion or limiting instruction. ECF No. 17, attach. 2 at 5-6. Reece testified as to statements allegedly made by Davis, the Defendant. Clearly, the party admission exception to the hearsay rule applies, the Court would **FIND** that the state court's determination was not unreasonable, and therefore, the Court would recommend that claim G be dismissed.

Similarly, in claim H, Davis claims that Mr. Clary was ineffective for failing to request this jury instruction: "where evidence is equally susceptible of two or more interpretations, one of which is consistent with innocence, the jury cannot arbitrarily adopt the interpretation which incriminates." The state court dismissed this claim as well because the record demonstrates that the jury received the following standard jury instructions: the presumption of innocence, reasonable doubt, how the jury was to judge the witnesses and the evidence, circumstantial evidence, and that "the evidence as a whole must exclude every reasonable theory of innocence."

The state court found that Davis did not articulate how his jury instruction was substantively different from the jury instructions that were actually given to the jury. ECF No. 17, attach 2 at 6. As such, the state court found that Davis failed to satisfy either prong of *Strickland*. The Court would **FIND** that the state court's application of *Strickland* was reasonable, and therefore, recommends dismissing claim H.

In claim I, Davis claims that Mr. Clary was ineffective for failing to object to allegedly improper remarks made by prosecutors during closing statements regarding the credibility of witnesses, the evidence, the burden of proof, and that Mr. Clary failed to request a cautionary instruction or move for a mistrial based on those remarks. The state court dismissed this claim for failing to meet either prong of the *Strickland* burden, because Mr. Clary was not required to object to the proper closing remarks of prosecutors; the state court found that the remarks restated the evidence presented at trial, and even informed the jury that what was said during closing arguments could not be considered as evidence. ECF No. 17, attach. 2 at 4. This determination was not unreasonable under *Strickland*. Moreover, not only was Mr. Clary not required to raise a futile objection, but the record reflects that he gave a very strong, and persuasive closing argument in opposition to the prosecutors. Therefore, the Court would **FIND** that the state court reasonably applied *Strickland*, and recommends that claim I be dismissed.

In claim J and claim K, Davis claims counsel was ineffective for failing to raise issues on appeal: specifically, in claim J, Davis claims counsel was ineffective for failing to raise the issue of sufficiency of the evidence on appeal, and in claim K, Davis claims counsel was ineffective for failing to raise other issues that were denied by the Court of Appeals in his appeal to the Supreme Court of Virginia. In dismissing both claims, the state court found that Davis failed to satisfy either prong under *Strickland* because the "selection of issues to address on appeal is left

to the discretion of the appellate counsel, and counsel need not address every possible issue on appeal." ECF No. 17, attach. 2 at 7 (citing *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). Again, it was not unreasonable for the state court to determine that Davis failed to support both claims with sufficient proof to satisfy *Strickland's* demanding standard, and therefore, the Court would **FIND** that the state court's application of *Strickland* was reasonable, and recommends dismissing claims J and K.

2. The state court did not unreasonably apply federal law in denying Davis' claim B.

Lastly, in claim B, Davis claims that his rights under the Fifth and Fourteenth Amendments were violated during the June 13, 2006 custodial interrogation. Specifically, he claims law enforcement officials continued to question him after he requested an attorney, and that the statements he gave were not voluntary and knowing. This state court dismissed this claim on direct appeal when it found that the during the suppression hearing, the trial court accepted the law enforcement officer's testimony that they re-read Davis the *Miranda* warnings after he repeatedly expressed a desire to continue speaking with them. ECF No. 17, attach. 1 at 4-5 (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding a suspect may not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police.")). The Court would **FIND** that the state court's determination and application of Davis' rights against self-incrimination and right to an attorney were reasonable, especially in light of the record, which reflects Davis received *Miranda* warnings on multiple occasions, and therefore, the Court recommends dismissing claim B as well.

## C. Recommended Relief

Once a federal habeas petitioner in state custody demonstrates an entitlement to federal habeas relief, the federal district court has wide discretion in choosing an appropriate remedy. *See* 28 U.S.C. § 2243 ("The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."). However, "[w]ithin the strictures of these principles, federal courts have most often granted relief in habeas cases that has required the least intervention into the state criminal process." *Henderson v. Frank*, 155 F.3d 159, 168 (3d Cir. 1998). Although a federal court may conditionally, or unconditionally, order the petitioner's release, it lacks the power under habeas to revise a challenged state court judgment itself in order to correct constitutional errors. *Fay v. Noia*, 372 U.S. 391, 430-31 (1963) (abrogated on other grounds by *Coleman v. Thompson*, 501 U.S. 722 (1991)) (overruled in part on other grounds by *Wainwright v. Sykes*, 433 U.S. 72 (1977)).

Indeed, the most common remedy imposed by federal courts in habeas cases is a conditional release order, meaning the state government is required to release the prisoner, unless it takes remedial action within a prescribed period of time, such as retrying the petitioner. *Herrera v. Collins*, 506 U.S. 390, 403 (1993); *accord Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) ("[T]his Court has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court."). In the event the state government fails to comply with the conditional release order by not instituting retrial proceedings within the specified period of time, this Court may order the petitioner's unconditional release. *Wilkinson v. Dotson*, 544 U.S. 74, 87 (2005) (Scalia, J., concurring) ("Conditional writs enable habeas courts to give States time to replace an invalid judgment with a valid one, and the consequence when they fail

to do so is always release."). But, if the state meets the terms of the federal habeas court's condition, thereby avoiding the writ's actual issuance, the habeas court no longer retains any further jurisdiction over the matter. *Pitchess v. Davis*, 421 U.S. 482, 490 (1975).

Accordingly, the undersigned **RECOMMENDS** that Davis' petition for a writ of habeas corpus be **CONDITIONALLY GRANTED.** The undersigned **RECOMMENDS** that this Court retain jurisdiction over this matter, unless the Commonwealth of Virginia institutes a re-trial proceeding to correct the constitutional violation found by this Court, at which point this Court would lose jurisdiction and the writ would not actually issue. However, if such a re-trial is not commenced within a reasonable period of time from the date of this Court's final order, then the undersigned **RECOMMENDS** that Davis' petition for a writ of habeas corpus be **UNCONDTIONALLY GRANTED.**

## V. RECOMMENDATION

For all of the reasons discussed above, the undersigned **RECOMMENDS** the Respondent's motion to dismiss, ECF No. 16, be **DENIED** and Davis' petition, ECF No. 1, be **CONDITIONALLY GRANTED,** pending the commencement of re-trial proceedings by the Commonwealth of Virginia within a reasonable period of time from this Court's final order. The Court is recommending a significant, but just, remedy. Due to the egregious nature of the constitutional violation in this case, the Court is aware of no other sufficient remedy, and therefore recommends that Davis be granted a new trial.

## VI. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, computed pursuant to Federal

Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

2. A United States District Judge will make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the Petitioner, the Petitioner's counsel, and the Respondent's counsel.

/s/
Lawrence R. Leonard
United States Magistrate Judge

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
February 12, 2014

## CLERK'S MAILING CERTIFICATE

A copy of this Report and Recommendation was mailed on this date to the following:

Mr. Ryan O'Neal Davis, #1108060
Red Onion State Prison
P.O. Box 1900
Pound, Virginia 24279
*Pro Se* Petitioner

Mr. David W. Lannetti
Vandeventer Black LLP
500 World Trade Center
Norfolk, Virginia 23510
Counsel for the Petitioner

Ms. Leah Ann Darron
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Counsel for the Respondent

Fernando Galindo
Clerk of the Court

By:

Deputy Clerk
February 12, 2014

57